1  Gordon H. DePaoli
   Nevada State Bar No. 195
2  Domenico R. DePaoli
   Nevada State Bar No. 11553
3  Woodburn and Wedge
   6100 Neil Road, Suite 500
4  Reno, Nevada  89511
   Telephone:  775/688-3000
5  Attorneys for Crosby Lodge, Inc.

6

7

8              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEVADA
9

10 CROSBY LODGE, INC., a Nevada corporation,      Case No. 3:06-CV-00657-LRH-RAM

11                          Plaintiff,
                  v.
12                                                 MEMORANDUM OF POINTS AND
   NATIONAL INDIAN GAMING                          AUTHORITIES OF CROSBY
13 COMMISSION; PYRAMID LAKE PAIUTE                 LODGE, INC. IN SUPPORT OF
   TRIBAL GAMING COMMISSION; MERVIN                MOTION FOR SUMMARY
14 WRIGHT, JR.; DOES I through IV; and             JUDGMENT
   PYRAMID LAKE PAIUTE TRIBE OF
15 INDIANS,

16                          Defendants.
                                          /
17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

I.       PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.      STATEMENT OF BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . .   1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

I.       THE NATIONAL INDIAN GAMING COMMISSION'S REGULATION 25
         C.F.R. § 522.10(c), MANDATING THAT TRIBAL ORDINANCES OR
         RESOLUTIONS AUTHORIZING NON-TRIBAL CLASS III GAMING
         REQUIRE THAT NOT LESS THAN 60 PERCENT OF THE NET
         REVENUES BE INCOME TO THE TRIBE, IS AN IMPERMISSIBLE
         INTERPRETATION OF THE IGRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

         A.      The IGRA Does Not Authorize the NIGC to Mandate Impositions on
                 Non-Tribal Class III Gaming Through 25 C.F.R. § 522.10(c) Because
                 the Language, Structure and Legislative History of the IGRA Shows
                 That Congress Did Not Intend Such a Delegation . . . . . . . . . . . . . . . .   5

                 1.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

                 2.      The Statutory Language of the IGRA Expressly Allowing a
                         Tribe to Authorize Any Person or Entity to Engage in Class III
                         Gaming Shows That Congress Did Not Intend That
                         Requirements Applicable to Exceptions to the Rule That Only
                         Tribes May Engage in Class II Gaming Would Apply to Class
                         III Gaming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

                 3.      The Statutory Language of the IGRA Specifically Authorizing
                         Tribal-State Compacts to Address Tribal Impositions on Non-
                         Tribal Class III Gaming at Amounts Comparable to Those
                         Assessed by the State for Comparable Activities Shows That
                         Congress Did Not Intend That the NIGC Mandate the Amount
                         Which a Tribe Must Impose . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

                 4.      Congress Did Not Intend to Delegate Authority to the NIGC to
                         Mandate Impositions on Non-Tribal Class III Gaming Because
                         Congress Gave the NIGC Virtually No Role in Connection
                         With Class III Gaming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

5.   The Circumstances of the IGRA's Enactment, Its Legislative History, and Applicable Caselaw, Further Support the Conclusion That the NIGC Does Not Have the Authority to Mandate the Level of Impositions Which Indian Tribes Must Impose on Non-Tribal Class III Gaming . . . . . . . . . . . . . . . . .   20

II.   THE NIGC'S CONSTRUCTION OF THE IGRA AS MANDATING THAT TRIBAL ORDINANCES AUTHORIZING NON-TRIBAL CLASS III GAMING REQUIRE THAT NOT LESS THAN 60 PERCENT OF NET REVENUES BE INCOME TO THE TRIBE IS NOT A REASONABLE INTERPRETATION, AND IS NOT ONE WHICH CONGRESS WOULD SANCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

**TABLE OF AUTHORITIES**

**CASE LAW**

*Artichoke Joe's California Grand Casino v. Norton* . . . . . . . . . . . . . . . . . . . . . . .   6, 21,
353 F.3d 712 (9th Cir. 2003)   29

*California v. Cabazon Band of Mission Indians* . . . . . . . . . . . . . . . . . . . . . . . . .   20, 21
480 U.S. 202 (1987)

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* . . . . . . . . . . . . .   3, 4,
467 U.S. 837 (1984)   26-30

*Cheyenne River Sioux Tribe v. South Dakota* . . . . . . . . . . . . . . . . . . . . . . . . .   25
3 F.3d 273 (8th Cir. 1993)

*Colorado River Indian Tribes v. National Indian Gaming Commission* . . . . . . . . .   7, 8,
383 F.Supp.2d 123 (D.D.C. 2005); *aff'd.,* 466 F.3d 134 (D.C. Cir. 2006)   19-21,
23, 24,
29

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.* . . . . . . . . . .   6-8,
529 U.S. 120, 120 S.Ct. 1291 (2000)   28

*In Re Indian Gaming Related Cases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21, 25
331 F.3d 1094 (9th Cir. 2003)

*Montana v. Blackfeet Tribe of Indians* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28, 29
471 U.S. 759, 105 S.Ct. 2399 (1985)

*Natural Resources Defense Council v. United States Environmental Protection
Agency* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3, 4
526 F.3d 591 (9th Cir. 2008)

*Navajo Nation v. Department of Health and Human Services* . . . . . . . . . . . . . . . . .   28
    325 F.3d 1133 (9th Cir. 2003)

*Rumsey Indian Rancheria of Wintun Indians v. Wilson* . . . . . . . . . . . . . . . . . . . . .   25
    64 F.3d 1250 (9th Cir. 1994) <u>amended</u> by 99 F.3d 321 (9th Cir. 1996)

*Williams v. Babbitt* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
    115 F.3d 657 (9th Cir. 1997)


**STATUTES, REGULATIONS AND RULES**

25 C.F.R. § 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

25 U.S.C. § 2701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

25 U.S.C. § 2702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

25 U.S.C. § 2705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

25 U.S.C. § 2706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 8,
    26

25 U.S.C. § 2710 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-11,
    13, 15,
    16,
    18-22,
    25, 26

25 U.S.C. § 2711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

25 U.S.C.  § 2713 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23


**OTHER**

S.Rep. 100-446 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 23

134 Cong. Rec. 24016-24037 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 28

134 Cong. Rec. 25369-25381 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 29

1

**STATEMENT OF THE CASE**

2

**I.   PROCEDURAL BACKGROUND**

3

4

Crosby Lodge, Inc. ("Crosby") challenges 25 C.F.R. § 522.10(c), a regulation

5

promulgated by the National Indian Gaming Commission (the "NIGC") under the Indian

6

Gaming Regulatory Act (the "IGRA"), 25 U.S.C. §§ 2701, et seq.  That regulation purports to

7

mandate that tribal ordinances or resolutions authorizing non-tribal class III gaming require at

8

least 60 percent of the net revenue from such non-tribal gaming be "income to the tribe."

9

Crosby contends that the regulation is in excess of the NIGC's authority.  Doc. 23-1 at 10-11.

10

A detailed statement of the factual and procedural history of this matter is contained in

11

the Court's Order of December 3, 2008.  Doc. 58 at pgs. 1-5.  In that Order, the Court ruled that

12

Crosby could not bring an as applied challenge to 25 C.F.R. § 522.10(c), but equitably tolled

13

the statute of limitations so that Crosby's facial challenge to the regulation could proceed.  Doc.

14

58.

15

**II.   STATEMENT OF BACKGROUND FACTS**

16

17

Although not essential to Crosby's Motion, it is important to place this facial challenge

18

to 25 C.F.R. § 522.10(c) in the factual context which gives rise to this action.  That context

19

demonstrates why the NIGC has exceeded its authority with the regulation at issue.[1]

20

(1)      Crosby operates fifteen slot machines within a larger business which includes a

21

22

convenience store, a bar, a motel, a gasoline station, and boat storage, on lands owned in fee by

23

Fred and Judy Crosby, who are not members of the Tribe, and which fee lands are within the

24

exterior boundaries of the Pyramid Lake Indian Reservation.  *See*, Doc. 58 at 1-2.

25

26

27

28

---

[1] The NIGC filed the Administrative Record for promulgation of the regulation at issue here on December 11, 2009.  Doc. 63.  In this Memorandum, the Administrative Record is referred to by its docket number (63) and by its internal page number.

(2)     In 1993, the NIGC adopted and published in the Federal Register 25 C.F.R. § 522.10(c), which provides:

> § 522.10  Individually owned class II and class III gaming operations other than those operating on September 1, 1986.
> For licensing of individually owned gaming operations other than those operating on September 1, 1986 (addressed under § 522.11 of this part), a tribal ordinance shall require:
> * * *
> (c)  That not less than 60 percent of the net revenues be income to the Tribe.

(3)     On August 4, 1997, the Tribe and the State of Nevada ("Nevada") entered into a compact governing class III gaming within the Pyramid Lake Indian Reservation, which compact was approved by the Secretary of the Interior effective as of January 6, 1998 (the "Tribe-Nevada Compact").  *See*, Doc. 58 at 2.

(4)     Article VII of the Tribe-Nevada Compact provides:

> All of the net proceeds of Class III gaming on the Reservation shall be used for the public purposes of the Tribe.  If, at any time, any person or entity <u>other than the Tribe or its members</u> acquires any interest with respect to net revenues, the <u>Tribe shall adopt a scheme of taxation with respect to such person or entity at least as stringent as the State's system of taxation, as it now exists or is hereafter amended.</u>  The Tribe reserves the right to impose a scheme of taxation related to Reservation Gaming Activities that is more stringent than Nevada law.

*See*, Doc. 23-1, para. 21; Doc. 37, para. 21; Doc. 51-2, Exhibit A thereto.

(5)     Article IX of the Tribe-Nevada Compact entitled "Non-Tribal Gaming," provides:

> The Tribe may authorize gaming on the Reservation by persons other than the Tribe pursuant to 25 U.S.C. § 2710(d)(5), <u>but any such gaming must be authorized, licensed and conducted in accordance with the laws, regulations and procedures of the State</u>.  Any person other than the Tribe conducting such gaming shall be fully subject to the <u>concurrent jurisdiction of the Tribe and the State</u>.  Nothing in this Article shall authorize the State to collect any taxes or licensing fees from such persons.

*See*, Doc. 23-1, para. 20; Doc. 37, para. 20; Doc. 51-2, Exhibit A thereto.

(6)     Pursuant to the provisions of the IGRA and the Tribe-Nevada Compact, the governing body of the Tribe, the Pyramid Lake Paiute Tribal Council, adopted its Gaming Ordinance on August 30 1999.  *See*, Doc. 58 at 2.

(7)     The Tribe Gaming Ordinance allows for the licensing of non-tribal class III gaming, and imposes on such gaming all applicable taxes and fees imposed by the Pyramid Lake Tribal Tax Code.  The Pyramid Lake Tribal Tax Code includes Chapter 212, which adopts the existing requirements of Nevada law as license fees and slot machine fees and taxes for non-tribal gaming on the Reservation.  *See*, Doc. 23-1, para. 24; Doc. 37, para. 24; Doc. 51-2, Exhibits B and D thereto.

(8)     The Tribe Gaming Ordinance which was approved by the Chairman of the NIGC on July 19, 2000 does not include any provision requiring that 60 percent of the net revenues of non-tribal class III gaming be income to the Tribe.  *See*, Doc. 58 at 3.

## STANDARD OF REVIEW

Crosby challenges 25 C.F.R. § 522.10(c) with respect to non-tribal class III gaming under 5 U.S.C. § 706(2)(A) and (C) as not in accordance with law, and as in excess of the NIGC's statutory jurisdiction, authority and limitations.  The validity of the NIGC's decision in promulgating that regulation and this Court's review of it turns upon an interpretation of the IGRA.  A court reviews an agency's interpretation of a statute using the two step analysis outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See*, *Natural Resources Defense Council v. United States Environmental Protection Agency*, 526 F.3d 591, 603 (9th Cir. 2008).

The first step of the *Chevron* test requires the court to determine whether Congress "has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842; *Natural Resources Defense Council*, 526 F.3d at 602.   The court employs traditional tools of statutory

construction, including examination of the statute's text, structure, purpose and legislative history.  *Natural Resources Defense Council*, 526 F.3d at 603.

If the statute is silent or ambiguous with respect to the specific issue, the second question for the court is whether the agency's answer is based on a permissible construction of the statute.  *Chevron*, 467 U.S. at 842-843; *Natural Resources Defense Council*, 526 F.3d at 605.  When Congress makes an express delegation of authority to elucidate a specific provision of the statute by regulation, such "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 47 U.S. at 844; *Natural Resources Defense Council*, 526 F.3d at 602.  If, however, the delegation is implicit rather than explicit, subject to certain exceptions, courts defer to an agency's statutory interpretation so long as it is reasonable, "unless it appears from the statute or its legislative history that it is not one that Congress would have sanctioned."  *Chevron*, 467 U.S. at 844; *Natural Resources Defense Council*, 526 F.3d at 602.

## SUMMARY OF THE ARGUMENT

The IGRA expressly allows a tribe to authorize non-tribal class III gaming.  On the other hand, the IGRA outlaws non-tribal class II gaming except in two situations which must satisfy certain requirements.  The NIGC has taken the requirements for allowing an exception to the prohibition of non-tribal class II gaming, one of which is the requirement that "not less than 60 percent of the net revenue be income to the Tribe," and imposed them as requirements for non-tribal class III gaming.

A careful review of the text, structure, legislative history, and purpose of the IGRA leads to the inescapable conclusion that Congress did not intend to give the NIGC authority to issue class III gaming regulations, and certainly not this one.  The IGRA contains no language which authorizes the NIGC to mandate what a Tribe must include in an ordinance with respect to "impositions" on persons, organizations or entities authorized by the ordinance to engage in

-4-

class III gaming.[2]  The IGRA sets forth specific subjects to be covered by a tribal ordinance authorizing class III gaming, which subjects do not include the extent of tribal impositions on such gaming.  It delegates authority to approve such ordinances to the Chairman, and requires the Chairman to approve such ordinances except in two circumstances, neither of which involve the extent of tribal impositions on non-tribal class III gaming activity.

In contrast, the IGRA contains language expressly permitting Tribal-State Compacts to address the question of tribal impositions on such gaming activities.  Other provisions of the IGRA reflect that Congress limited the role of the NIGC in connection with class III gaming.  The structure and the legislative history of the IGRA reflect that Congress intended to allow an Indian tribe and a State, two sovereigns, to negotiate the economics of class III gaming so that each could protect their respective interests, and so that neither would be protected from the free market competition of the other.  Requiring tribes to impose a fee of at least 60 percent of net revenues on non-tribal class III gaming places any tribe which chooses to allow such gaming at a competitive disadvantage to gaming outside of Indian lands, which Congress clearly intended to avoid.  Finally, but equally important, the NIGC's interpretation of the IGRA here is an interference with Indian tribal sovereignty, and is inconsistent with the Indian canon of construction that statutes benefitting Indians be liberally construed in their favor.

## ARGUMENT

I.  **THE NATIONAL INDIAN GAMING COMMISSION'S REGULATION 25 C.F.R. § 522.10(c), MANDATING THAT TRIBAL ORDINANCES OR RESOLUTIONS AUTHORIZING NON-TRIBAL CLASS III GAMING REQUIRE THAT NOT LESS THAN 60 PERCENT OF THE NET REVENUES BE INCOME TO THE TRIBE, IS AN IMPERMISSIBLE INTERPRETATION OF THE IGRA.**

    A.  **The IGRA Does Not Authorize the NIGC to Mandate Impositions on Non-Tribal Class III Gaming Through 25 C.F.R. § 522.10(c) Because the**

---

[2] The word "impositions" is used here as a synonym for "taxes" or "fees."  Clearly, in the context of non-tribal gaming, a tribe must impose a "tax" or a "fee" in order to have 60 percent of the net revenues be income to it.  In cases of tribal gaming, it receives all of the net revenues.

**Language, Structure and Legislative History of the IGRA Shows That Congress Did Not Intend Such a Delegation.**

### 1.      Introduction.

The powers of administrative agencies are wholly derived from, and defined and limited by statute.  *See*, *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000).   The agency may not "exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law'."  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125.

Courts 'interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will.'  *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003).  Courts 'begin . . . with the language of the statute.'  *Artichoke Joe's*, 353 F.3d at 720.  Where the words of the statute are 'unambiguous . . . judicial inquiry is complete.'  *Artichoke Joe's* at 720.   When 'the language is not dispositive, [courts] . . . look to the congressional intent revealed in the history and purposes of the statutory scheme.'  *Artichoke Joe's* at 720.  A reviewing "court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'  *Brown & Williamson*, 529 U.S. at 126.  If the intent of Congress is clear, that is the end of the matter.

In determining if Congress has expressly addressed the specific question at issue, a reviewing court should not confine itself to examining a particular statutory provision at issue.  *Brown & Williamson*, 529 U.S. at 132.  Rather, the meaning of certain words only become evident when placed in context.  *Brown & Williamson*, 529 U.S. at 132.  It is a 'fundamental canon of statutory construction that the words of a statute must be read in their overall context and with a view to their place in the overall statutory scheme.'  *Brown & Williamson*, 529 U.S. at 132.  Statutes must be interpreted as a symmetrical and coherent regulatory scheme and with all the parts fitting into one harmonious whole.  *Brown & Williamson*, 529 U.S. at 133.

Congress has precluded the NIGC from mandating, by its own regulation, the substance of tribal class III gaming ordinances.  Interpreting the IGRA to permit the NIGC such class III gaming regulatory authority is inconsistent with the administrative structure Congress enacted in the IGRA.  *C.f.*, *Colorado River Indian Tribes v. NIGC*, 383 F.Supp.2d 123 (D.D.C. 2005), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006).   Regardless of the NIGC's justifications for its promulgation of 25 C.F.R. § 522.10(c), the agency may not exercise its authority in a manner inconsistent with the whole administrative structure Congress enacted in the IGRA.  *C.f.*, *Brown & Williamson*, 529 U.S. at 125.

An examination of the IGRA reveals the place of the NIGC in the overall statutory scheme and the limits of its administrative powers.  The IGRA establishes a symmetrical and coherent regulatory scheme wherein the sole source of class III gaming regulation is to be Tribal-State compacts, approved by the Secretary of Interior, and tribal ordinances or resolutions, meeting the IGRA's requirements and approved by the Chairman, and wherein the administrative authority of the NIGC is limited and does not extend to regulation of non-tribal class III gaming.  Further, interpreting the IGRA as a symmetrical and coherent regulatory scheme and fitting all the parts into one harmonious whole reveals that Congress did not intend to delegate to the NIGC the authority to mandate impositions on non-tribal class III gaming, and thereby supersede provisions of negotiated and approved Tribal-State compacts and/or Chairman-approved tribal ordinances or resolutions.

The powers of the Commission are set forth in 25 U.S.C. § 2706.  With the exception of the authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions" of the IGRA, the powers of the Commission are unextraordinary, and range from such mundane activities as approving an annual budget, to use of U.S. mails, procuring supplies, conducting hearings, and administering oaths, to monitoring class II gaming, and inspecting and examining premises on which class II gaming is conducted.  There

is no express grant of authority authorizing the NIGC to promulgate a regulation mandating the content of tribal ordinances for class III, or any other gaming.

In promulgating the regulation at issue here, the NIGC relied upon 25 U.S.C. § 2706(b)(10), which gives it authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this chapter."  Doc. 63 at 49.  That authority does not save the regulation at issue here.  Courts (and agencies) are not free to interpret a statute in ways which are at odds with the statute's language, structure and legislative history. *C.f., Brown & Williamson*, 529 U.S. 120.  In *Colorado River*, both the District Court and the Court of Appeals held that 25 U.S.C. § 2706(b)(10) did not give the NIGC authority to promulgate a rule regulating class III gaming.  383 F.Supp.2d at 143-145; 466 F.3d at 139-140.

> **2.    The Statutory Language of the IGRA Expressly Allowing a Tribe to Authorize Any Person or Entity to Engage in Class III Gaming Shows That Congress Did Not Intend That Requirements Applicable to Exceptions to the Rule That Only Tribes May Engage in Class II Gaming Would Apply to Class III Gaming.**

As is discussed below, the requirements in 25 C.F.R. § 522.10(c) derive from provisions in the IGRA authorizing exceptions to the general rule that an Indian tribe must have the sole proprietary interest in and responsibility for the conduct of **class II gaming**.  There is no such requirement for class III gaming, and thus no need to satisfy requirements for an exception.

The statutory language of the IGRA shows that Congress did not intend to delegate authority to the NIGC to mandate impositions on non-tribal class III gaming.  The first of the three prerequisites for class III gaming on Indian lands is that such activities are:

> (A)    authorized by an ordinance or resolution that:
>      (i)    is <u>adopted</u> by the <u>governing body of the Indian tribe</u> having jurisdiction over such lands,
>      (ii)    meets the <u>requirements</u> of subsection (b) of this section, and
>      (iii)    is approved by the <u>Chairman</u>,

25 U.S.C. § 2710(d)(1)(A).  [Emphasis added].

-8-

The authorization for class III gaming is to be contained either in an ordinance or simple resolution "adopted by the governing body of the Indian tribe."  There is nothing in the IGRA which grants the NIGC the authority to adopt all or any part of an ordinance or resolution for a tribe by prescribing its content by regulation.  The authority to approve tribal ordinances or resolutions authorizing class II and class III gaming is delegated to the Chairman, subject to appeal to the NIGC by 25 U.S.C. § 2705(a)(3).  There is nothing in 25 U.S.C. § 2705 that grants the Chairman, much less the NIGC, the authority to prescribe the content of tribal ordinances for class II or class III gaming.

Section 2710(d)(2)(A) includes additional detail concerning the process which a tribe must follow for purposes of authorizing class III gaming.  It provides:

> If any Indian tribe proposes to engage in, or authorize any person or entity to engage in, a class III gaming activity on Indian lands of the Indian tribe, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution that meets the requirements of subsection (b) of this section.

[Emphasis added].  Section 2710(d)(2)(A) expressly allows a tribe to authorize any person or entity to engage in class III gaming on Indian Lands.

The Chairman's authority to disapprove a tribal ordinance or resolution is limited.  The Chairman "shall approve an ordinance or resolution described in [that] subparagraph (A)" unless "it was not adopted in compliance with the governing documents of the Indian tribe, or the tribal council "was significantly and unduly influenced" in its adoption by a person who poses the threats described in 25 U.S.C. § 2711(e)(1)(D).  *See*, 25 U.S.C. § 2710(d)(2)(B).  Section 2710(d)(2)(C) goes on to provide that class III gaming activity on the Indian lands of the Indian tribe "shall be fully subject to the terms and conditions of the Tribal-State compact entered into under paragraph (3) by the Indian tribe that is in effect."  Both 25 U.S.C. § 2710(d)(2)(A)  and  U.S.C. § 2710(d)(1)(A)(ii) require that the tribal ordinance meet the "requirements of subsection (b)" of Section 2710.  *Id.*

-9-

It is that reference to the "requirements" of subsection (b) which is at the heart of this dispute.  The issue is which provisions in 25 U.S.C. § 2710(b) encompass the **requirements** which a tribal ordinance or resolution allowing class III gaming must meet.  It is important to note that the tribal ordinance must meet the requirements of 25 U.S.C. § 2710(b) whether the class III gaming is engaged in by the tribe, or by any other person or entity.  Equally important is that 25 U.S.C. § 2710(d)(2)(A) expressly allows a tribe to authorize any person or entity to engage in class III gaming on Indian Lands.

Subsection (b) of Section 2710 applies to regulation of class II gaming.  Subparagraph (2) of that subsection provides the requirements for a tribal ordinance:

> (2)    The Chairman shall approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if such ordinance or resolution provides that --
>> (A)    except as provided in paragraph (4), the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity;
>> (B)    net revenues from any tribal gaming are not to be used for purposes other than --
>>> (i)    to fund tribal government operations or programs;
>>> (ii)    to provide for the general welfare of the Indian tribe and its members;
>>> (iii)    to promote tribal economic development;
>>> (iv)    to donate to charitable organizations; or
>>> (v)    to help fund operations of local government agencies;
>> (C)    annual outside audits of the gaming, which may be encompassed within existing independent tribal audit systems, will be provided by the Indian tribe to the Commission;
>> (D)    all contracts for supplies, services, or concessions for a contract amount in excess of $25,000 annually (except contracts for professional legal or accounting services) relating to such gaming shall be subject to such independent audits;
>> (E)    the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety; and
>> (F)    there is an adequate system which --
>>> (i)    ensures that background investigations are conducted on the primary management officials and key employees of the gaming enterprise and that oversight of such officials and their management is conducted on an ongoing basis; and
>>> (ii)    includes --

-10-

(I)     tribal licenses for primary management officials and key employees of the gaming enterprise with prompt notification to the Commission of the issuance of such licenses;
(II)     a standard whereby any person whose prior activities, criminal record, if any, or reputation, habits and associations pose a threat to the public interest or to the effective regulation of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming shall not be eligible for employment; and
(III)     notification by the Indian tribe to the Commission of the results of such background check before the issuance of any of such licenses.

[Emphasis added].

The structure of the IGRA shows that Congress did not intend to delegate authority to the NIGC to mandate impositions on non-tribal class III gaming.  As emphasized above, for class II gaming, the general rule under the IGRA is that the "Indian tribe have the sole proprietary interest and responsibility for the conduct of any gaming activity."  The NIGC has taken the provisions of subsection (b)(4) of 25 U.S.C. § 2710(d)(2)(A), which are **requirements** for an exception to that **class II gaming** sole proprietary interest rule, and made them a **requirement** for non-tribal class III gaming even though the express allowance for non-tribal class III gaming requires no such exception.  25 U.S.C. § 2710(d)(2)(A).  The NIGC's misinterpretation of the IGRA in this regard is made express in the Administrative Record where NIGC states that the IGRA requires "class III gaming ordinances to meet the same requirements as class II gaming ordinances" and that tribes have "no discretion, however, regarding the sole proprietary interest provision" with respect to class III gaming.  Doc. 63 at 0049.  The NIGC is wrong.  Congress expressly gave the tribes the authority to allow non-tribal class III gaming.  The requirements for an exception are not needed because no exception is required.

That becomes more evident when one considers the exceptions which are allowed to the sole proprietary interest rule with respect to class II gaming.  The two exceptions are set forth in paragraph 4 of 25 U.S.C. § 2710(b).  Paragraph (4)(A) provides an exception is allowed if

-11-

the tribal <u>licensing</u> requirements include the requirements described in the subclauses of subparagraph (B)(i) of paragraph (4), and are at least as restrictive as those established by State law governing similar gaming within the jurisdiction of the State within which such Indian lands are located, <u>and in addition</u>, the person receiving the license must also be able to receive a license to conduct the same activity within the jurisdiction of the State.   Thus, for that exception to apply, the person must be able to receive a license to conduct the same activity within the State in question and outside of Indian lands.

Although this action is directed at 25 C.F.R. § 522.10(c), the substance of § 522.10(e) and (f) further highlight why those exception provisions in paragraph (4) were not intended to apply to class III gaming.  Those provisions state that a tribal ordinance shall require:

> (e)     Licensing standards that are at least as restrictive as those established by State law governing similar gaming within the jurisdiction of the surrounding State; and
> (f)     Denial of a license for any person or entity that would not be eligible to receive a State license to conduct the same activity within the jurisdiction of the surrounding State.   State law standards shall apply with respect to purpose, entity, pot limits and hours of operation.

Those are issues to be addressed by the tribes and the States in Tribal-State compacts.  They are not subjects to be addressed by the NIGC in a regulation.

The second exception to the IGRA's general rule that the Indian tribe must have the sole proprietary interest in class II gaming is in subparagraph (4)(B)(i).  That subparagraph also establishes an exception to the requirement in subparagraph (4)(A) that the person being individually licensed by the tribe also be eligible to receive a State license to conduct the same activity within the jurisdiction of the State, <u>i.e.</u>, not on Indian land.  Subparagraph (4)(B)(i) is a grandfather provision which allows the continued operation of an individually owned class II gaming operation <u>that was operating on September 1, 1986</u>.  That subparagraph expressly allows for the continuation of individually owned class II gaming operating on September 1, 1986, even if it is not operated by the tribe and even if it exists in a State which would not

allow the person or entity to be eligible to receive a state license to conduct the same activity within the jurisdiction of the State.  In the context of class III gaming, there is no such exception.  A Tribal-State compact is required.  *See*, 25 U.S.C. § 2710(d)(1)(B).  The grandfathering nature of this subparagraph is further evidenced by the provisions of subparagraph (4)(B)(ii), which prohibits transfer of the exemption to another person or entity, and also prohibits changes in the nature and scope of the activity beyond what was operated on October 17, 1988, and by subparagraph (4)(B)(iii) which requires that "within sixty days of October 17, 1988, the Secretary shall prepare a list of each individually owned gaming operation to which clause (i) applies and shall publish such list in the Federal Register."

Under both of those exceptions, the tribal licensing requirements must include a provision "that not less than 60 percent of the net revenues is income to the Indian tribe," along with some other requirements, one of which duplicates the requirements of 25 U.S.C. § 2710(b)(2)(B).  Unlike the provisions of 25 U.S.C. § 2710(b), which generally <u>prohibit</u> non-tribal class II gaming, the provisions of 25 U.S.C. § 2710(d) expressly <u>authorize</u> non-tribal class III gaming to the extent allowed by the Tribal-State compact.  Thus, when 25 U.S.C. § 2710(d)(1)(A)(ii) and § 2710(d)(2)(A) refer to an ordinance for class III gaming meeting "the requirements of subsection (b)," they refer only to the requisite elements of tribal class III gaming ordinances, and do not refer to provisions in subsection (b) which are requirements only for exceptions that allow for class II gaming which the IGRA otherwise prohibits.

In the context of "non-tribal class III gaming," the ordinance must meet the requirements of 25 U.S.C. § 2710(b)(2) which apply to non-tribal gaming which the IGRA expressly allows, and which make sense in the context of non-tribal compared to tribal class III gaming.  Thus, the ordinance need not provide that the Tribe must have the sole proprietary interest and responsibility for the conduct of class III gaming because the IGRA expressly states otherwise.  *See*, 25 U.S.C. § 2710(b)(2)(A).  Perhaps, the most telling indication that the

-13-

provisions of paragraph (4)(B)(i)(III) do not apply is the fact that there is nothing in the Tribe Gaming Ordinance which requires that 60 percent of the net revenues from non-tribal class III gaming be income to the Tribe, and the Chairman approved it.  If such a provision was required to be in that Ordinance, the Chairman could not have approved it.

The legislative history of the IGRA confirms that the not less than 60 percent of the net revenue requirement is applicable only to **individually operated class II gaming** which was also permissible under State law, or which was in operation prior to September 1, 1986, even if not permissible under State law.  That requirement has absolutely nothing to do with class III gaming.  The Report of the Senate Select Committee on Indian Affairs states:

> Individually-owned Class II Games.  Section 11(b)(4)(A) and (B) <u>deal with the issue of individually owned and operated Class II bingo and card games</u>.  It is the Committee's intent that all gaming, other than tribally owned gaming, on Indian lands be operated under State law.  The Committee views tribal gaming as <u>governmental gaming, the purpose of which is to raise tribal revenues for member services</u>.  In contrast, while income may accrue to a tribe through taxation or other assessments on an individually owned bingo or card game, <u>the purpose of an individually owned enterprise is profit to the individual owner</u>(s) of Indian trust lands.  While a tribe should license such enterprises as part of its governmental function, the Committee has determined that State law ... should apply to such enterprises.  These games are not be confused with units of a tribe or tribal social or charitable organizations that operate gaming to support their charitable purposes; such games are not covered by this paragraph but rather will come under tribal gaming.   The individual games operated prior to September 1, 1986, may continue to operate under tribal ordinance <u>and without regard to State [law], if such games provide 60 percent of net revenues to the tribe</u> and the owner pays as assessment to the Commission under 18(a)(1).  The date of September 1, 1986, was incorporated in the final Senate version of HR 1920 in the 99th Congress and all individuals were thus on notice on that date that individually owned games would not likely be permitted in any final legislation adopted by Congress.

S. Rep. 100-446 at pages 12-13.  [Emphasis added].

That legislative history also is a Congressional recognition of the difference between tribal gaming, or "governmental" gaming, which has as its purpose raising revenues for tribal member services, and the income which might accrue to a tribe through taxation of non-tribal gaming, the purpose of which is profit to the individual owner.  Except as allowed by the

paragraph (4) exceptions, Congress required that class II gaming be "governmental gaming."  It did not impose that requirement on class III gaming, and expressly allowed non-tribal gaming, the purpose of which is profit to the individual owner, subject to income accruing to a tribe through tribal taxation.

> **3.      The Statutory Language of the IGRA Specifically Authorizing Tribal-State Compacts to Address Tribal Impositions on Non-Tribal Class III Gaming at Amounts Comparable to Those Assessed by the State for Comparable Activities Shows That Congress Did Not Intend That the NIGC Mandate the Amount Which a Tribe Must Impose.**

The statutory language of the IGRA shows that Congress intended Tribal-State compacts, and tribal governing body adopted and Chairman-approved tribal ordinances or resolutions to be the sole source of Indian lands class III gaming regulation.  The second and third prerequisites for class III gaming on Indian lands are that such activities are:

> (B)     located in a State that permits such gaming for any purpose by any person, organization, or entity, and
> (C)     conducted in conformance with a Tribal-State Compact entered into by the Indian Tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1)(B) and (C).   Nevada is clearly a State which meets the second prerequisite.  Moreover, that second requirement is not a prerequisite for individually owned class II gaming in operation on September 1, 1986.

The third prerequisite is implemented through Section 2710(d)(3)(A), which authorizes Indian tribes having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, to request the State in which the lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact.  Any negotiated Tribal-State compact may include provisions relating to:

> (i)     the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii)    the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii)    the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activities;

(iv)    taxation by the Indian tribe of such activity in <u>amounts comparable to amounts assessed by the State for comparable activities</u>;

(v)    remedies for breach of contract;

(vi)    standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii)    any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).  [Emphasis added].  The Secretary of the Interior is authorized to approve any Tribal-State compact.  *See*, 25 U.S.C. § 2710(d)(8)(A).

The provisions in 25 U.S.C. § 2710(d)(3)(C)(iv) concerning "taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities" is of particular importance here.  First, it is clear that it relates to non-tribal gaming because there is clearly no need for a tribe to tax gaming in which it has the sole proprietary interest.  Second, it describes a level of taxation "comparable to amounts assessed by the State for comparable activities."  The legislative history of the IGRA as reflected in the Senate Report and in statements in the Congressional Record, shows that Congress intended that States and tribes be allowed to negotiate compacts which are in their mutual best interests, and that what may be in the best interest of one Indian tribe and one State may not be the same for other Indian tribes in the same State, or for other States.  Compacts were expected to vary extensively depending on the type of gaming and location.  Congress was well aware that the levels of gaming taxation varied considerably in those States which allowed class III gaming, and that if compacts required tribes to tax at levels substantially higher than those imposed by the State on gaming within its jurisdiction, Indian tribes would be at a competitive disadvantage with respect to non-tribal gaming on Indian lands.

The Senate Report states:

In the Committee's view, both State and tribal governments have significant governmental interests in the conduct of class III gaming.  States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from the tribe and States.  This is a strong and serious presumption that must provide the framework for negotiations.  A tribe's governmental interests include raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on the Tribal Lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders.  A State's governmental interest with respect to class III gaming on Indian lands include the interplay of such gaming within the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens.  It is the Committee's intent that the compact requirement for class III not be used as justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.
\* \* \*
The terms of each compact may vary extensively depending on the type of gaming, the location, the previous relationship of the tribe and State, etc.  Section 11(d)(3)(C) describes the issues that may be the subject of negotiations between a tribe and the State in reaching a compact.  ....  A compact may allocate most or all of the jurisdictional responsibility to the tribe, to the State or to any variation in between.  ....

S. Rep. 100-446, 13-14.  [Emphasis added].

It is inconsistent with the intent of Congress to require that Indian tribes charge and receive 60 percent of the net revenue from non-tribal class III gaming in every case, or in any case.  Congress intended to allow tribes and States to negotiate compacts in their best interests.  Congress was especially concerned that States not use the compact for the protection of State-

licensed gaming enterprises from the market competition of class III gaming on Indian lands.[3] Given those concerns, Congress itself would not have placed Indian tribes in a position where they were absolutely required to tax non-tribal class III gaming at a level which ensured that such gaming could not compete with State-licensed gaming.  Yet, that would be the result here and elsewhere throughout the United States, if 25 C.F.R. § 522.10(c) is lawful.  It is clear from the language of 25 U.S.C. § 2710(d)(3)(C)(iv) and the legislative history that within the parameters of that section tribes and the States are free to address this issue in the context of their specific circumstances without a mandate from the NIGC that a tribe must charge at least 60 percent of the net revenues to non-tribal class III gaming activity.

State gaming taxes vary widely.  Attached hereto as Exhibit A is an Industry Information Sheet form the American Gaming Association which shows in general taxation levels for the 12 states with commercial casinos and the 12 states with racetrack casinos.  Many of the tax rates are graduated, and involve various formulae concerning "gross gaming revenue," which is usually sums received less payouts.  It is clear from this information that an absolute requirement that tribes in all States charge at least 60 percent of net revenue for non-tribal class III gaming will not work for the tribes.  Hence, Congress provided for levels of tribal taxation "comparable to amounts assessed by the State for comparable activities."

Here, the only charges which the Tribe has imposed are those in its Tax Code which are identical to those charged by Nevada, and which are the charges which Crosby has paid and continues to pay.  If the Tribe is mandated by 25 C.F.R. § 522.10(c) to impose a tax of 60

---

[3] For example, on the Senate floor, Senator McCain, a member of the Select Committee, said "we must ensure that the Indians are given a level playing field in order to install gaming operations that are the same as the States in which they reside and will not be prevented from doing so because of the self-interest of the State in which they reside."  134 Cong. Rec. at 24027 (1988).  Similarly, Congresswoman Vucanovich, on the House floor, said the IGRA was intended to achieve "a fair balancing of competitive economic interests."  134 Cong. Rec. at 25377 (1988).

percent of Crosby's net revenues, Crosby may cease gaming operations, and the Tribe may lose a consistent stream of revenue.  Crosby recognizes that the Tribe-Nevada Compact gives the Tribe that option.  However, the Tribal Council, in the exercise of its tribal sovereignty, has chosen not to impose it.

> **4.    Congress Did Not Intend to Delegate Authority to the NIGC to Mandate Impositions on Non-Tribal Class III Gaming Because Congress Gave the NIGC Virtually No Role in Connection With Class III Gaming.**

The IGRA includes no express language giving the NIGC any authority with respect to the content of tribal ordinances.  Other provisions of the IGRA support the conclusion that the NIGC has no role in prescribing the content of tribal ordinances with respect to class III gaming.  One such provision is 25 U.S.C. § 2710(d)(5), which, in effect, provides that nothing in the IGRA impairs the right of an Indian tribe to regulate class III gaming on Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with or less stringent than the State laws and regulations that are made applicable by any tribal-state compact.  One court has interpreted that provision to mean that the IGRA does not contemplate that there will be federal laws or regulations relating to the regulation of class III gaming at all. *See*, *Colorado River*, 383 F.Supp.2d at 136 (D.D.C. 2005), *aff'd.*, 466 F.3d 134 (D.C. Cir. 2006).  Similarly, and in support of that conclusion, 25 U.S.C. § 2710 (d)(1) views a tribal-state compact as the lone source for class III gaming regulation.  *Id.*, 383 F.Supp.2d at 136.  Indeed, when the IGRA bill was amended to reduce the size of the NIGC from five to three members, Senator McCain explained the amendment as reducing the "costs, borne in large part by gaming tribes, since the Commission would only be responsible for class II games."  134 Cong. Rec. at 24026-24027 (1988).

Finally, when a State and a tribe cannot agree on a Tribal-State compact, and an attempt at mediation is unsuccessful, the only provision in the IGRA which identifies a scenario in

-19-

which the federal government can become involved in class III gaming gives that authority to the Secretary of the Interior, rather than the NIGC.  *See*, 25 U.S.C. § 2710(d)(7)(B)(vii).  This, again, indicates that the NIGC has virtually no authority with respect to class III gaming. *Colorado River*, at 136-137.  The virtual absence of such authority further supports what is otherwise plainly clear; the NIGC has no authority to mandate the level of impositions that Indian tribes must impose on non-tribal class III gaming.

> **5.     The Circumstances of the IGRA's Enactment, Its Legislative History, and Applicable Caselaw, Further Support the Conclusion That the NIGC Does Not Have the Authority to Mandate the Level of Impositions Which Indian Tribes Must Impose on Non-Tribal Class III Gaming.**

An examination of the circumstances which resulted in the IGRA and its legislative history conclusively demonstrates that Congress did not intend that the NIGC have the authority to mandate that Indian tribes impose a charge, fee or tax of not less than 60 percent of net revenues on non-tribal class III gaming.  Those circumstances and the legislative history establish that Congress intended such issues to be a matter of negotiation between sovereigns, the Indian tribes and the States.

The IGRA begins with events leading up to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  In the 1970s, Indian tribes began to operate various forms of gaming on their lands as a way to generate revenue.  Those activities developed into contentious issues between the tribes and States over the authority of States to enforce their penal statutes against tribes.   In *Cabazon*, the Court determined that the application of state gaming laws to Indian gaming had not been authorized by Congress.  It also noted that state regulation of Indian gaming "would impermissibly infringe on tribal government."  The Court concluded that the States were without the authority to impose laws that regulate casino gaming on Indian lands.  It exempted from its ruling those state laws that prohibited, rather than regulated, gaming.  States that outlawed gaming in its entirety within

their borders were permitted to apply those laws to Indian casinos.  *Cabazon*, 480 U.S. at 216-222.

The IGRA, Congress's compromise to difficult questions involving Indian gaming, is an example of cooperative federalism in that it seeks to balance the competing sovereign interests of the federal government, state governments and Indian tribes by giving each roles in the regulatory scheme.  *See*, *Artichoke Joe's*, 353 F.3d at 715 (9th Cir. 2003); *In Re Indian Gaming Related Cases*, 331 F.3d 1094, 1096 (9th Cir. 2003).  The IGRA creates three classes of gaming, each subject to a different level of regulation.  Class I gaming, which includes social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of or in connection with tribal ceremonies or celebrations, is left exclusively within the jurisdiction of Indian tribes.  *See*, 25 U.S.C. § 2710(a).  Class II gaming, which includes bingo and certain card games, is also left within the jurisdiction of the tribes, but is subject to a complex scheme of shared regulation on the part of the NIGC and the Indian tribes. *See*, 25 U.S.C. § 2710(b).  Except with respect to class II gaming in operation on September 1, 1986, class II gaming on Indian lands must be located in a State that "permits such gaming for any purpose by any person, organization or entity."  *See*, 25 U.S.C. § 2710(b)(1)(A).  The general rule for class II gaming is that the Indian tribe must have the "sole proprietary interest and responsibility for [its] conduct."  *See*, 25 U.S.C. § 2710(b)(2)(A).  Class III gaming, which is all forms of gaming that are not class I gaming or class II gaming, is regulated pursuant to Tribal-State compacts.  *See*, *e.g., In Re Indian Gaming Related Cases*, 331 F.3d at 1096-98; *Colorado River*, 383 F.Supp.2d at 127.  Indeed, the Senate Report states that "S555 provides for a system for joint regulation by tribes and the federal government of Class II Gaming on Indian lands, and a system for compacts between tribes and States for regulation of Class III Gaming."  S. Rep. 100-446, at 1.  Moreover, the IGRA does not require that the Indian tribe have the sole proprietary interest in and responsibility for its conduct, and expressly allows the

-21-

authorization of "any person or entity to engage in, a class III gaming activity on Indian lands." *See*, 25 U.S.C. § 2710(d)(1); 2710(d)(2).

With respect to class III gaming, the Senate Report also states that "S.555 does not contemplate and does not provide for the conduct of Class III gaming activities on Indian lands in the absence of a Tribal-State compact." S. Rep. 100-446 at 6.  The Senate Report reflects an intention that States and the tribes be allowed to negotiate compacts which are in their mutual best interests, and that those interests would vary for the tribes and for the states.

The legislative history also shows that Congress did not intend to delegate authority to the NIGC to mandate impositions on non-tribal class III gaming.  The Senate Report states that "under the bill the Commission's principle *(sic)* responsibilities are with class II gaming and it will participate only minimally in class III gaming."  S.Rep. 100-446 at 11.  The NIGC's attempt in 25 C.F.R. § 522.10(c) to mandate the level of impositions in tribal class III gaming ordinances is not "minimal" participation in class III gaming; it is involvement in class III gaming in a way never intended by Congress.

The Senate Report with respect to class II gaming and section 2710(4)(B)(i)(III) of the IGRA [which the NIGC has embodied in 25 C.F.R. § 522.10(c)], also states that "Section 11(b)(4)(A) and (B) deal with the issue of individually owned and operated class II bingo and card games." S.Rep. 100-446 at 12.  In the same section, the Senate Report further states that "it is the Committee's intent that all gaming, other than tribally owned gaming, on Indian lands be operated under state law" but "those individual [bingo and card] games operated prior to September 1, 1986, may continue to operate under tribal ordinance and without regard to State purpose or hour and pot limits if such games provide 60 percent of net revenues to the tribe." S.Rep. 100-446 at 12.

The Senate Report further states that "the Commission will have the authority to <u>enforce tribal</u> gaming ordinances."  S.Rep. 100-446 at 8 [Emphasis added].  Further, "in determining

-22-

what patterns of jurisdiction and regulation should govern the conduct of gaming activities on Indian lands, the Committee has . . . attempted to balance the need for sound <u>enforcement</u> of gaming laws and regulations, with the strong Federal interest in preserving the <u>sovereign rights</u> of tribal governments to regulate activities and enforce laws on Indian land."  S.Rep. 100-446 at 5.  [Emphasis added].  The NIGC's authority to enforce such ordinances is limited to "tribal operator[s] of an Indian game, or a management contractor" and not to non-tribal class III gaming.  *See*, 25 U.S.C. § 2713.  An NIGC role limited to enforcing such <u>tribal</u> gaming ordinances is also consistent with the whole administrative structure enacted by Congress in the IGRA.

It is clear from the Report that the Select Committee did not "foresee the Commission regulating class III gaming."  *Colorado Indian Tribes*, 466 F.3d at 139.  If the Committee did not "foresee" regulation of class III gaming by the NIGC, it is a strong indication that Congress did not <u>intend</u> to grant class III gaming regulatory authority to the NIGC.  Absent such intention, the NIGC is clearly precluded by Congress from attempting to regulate class III gaming because the exercise of such authority is inconsistent with the intent expressed by Congress in the IGRA.  *See*, *Brown & Williamson*, 529 U.S. at 126.

Although the NIGC has authority to "promulgate such regulations and guidelines as it deems proper to implement the provisions" of the IGRA, its general rulemaking authority does not mean that its promulgation of class III gaming regulations in this instance is a valid exercise of that authority.  *See*, *Colorado River*, 466 F.3d at 139.  The NIGC is bound by and limited to the means Congress has deemed appropriate and prescribed for the pursuit of the ultimate purposes of the IGRA; in this case, the administrative structure Congress enacted in the IGRA, wherein there is no authority for the NIGC to regulate class III gaming operations.  *See*, *Colorado River*, 466 F.3d at 139-140.

It is true that, in the IGRA, Congress wanted to ensure that "the Indian tribe is the primary beneficiary of the gaming operation" but it also wanted to ensure such through "the statutory basis for the regulation of gaming" provided in the IGRA.  *C.f.*, *Colorado River*, 466 F.3d at 140; 25 U.S.C. § 2702(2).   In that sense, the situation here is analogous to that in *Colorado River*, where the NIGC was found to have no authority pursuant to the general rulemaking authority granted it by the IGRA to promulgate regulations establishing minimum internal control standards ("MICS") for class III gaming.  The NIGC justified the MICS merely as furthering the IGRA's stated congressional "purpose to promote integrity in Indian gaming." The Court rejected that reasoning because Congress also dictated that such purpose be accomplished only through "the statutory basis for the regulation of gaming provided in this Act" and no such statutory basis in the IGRA empowered the agency to regulate class III gaming operations.  *C.f.*, *Colorado River*, 466 F.3d at 140.

Here, the NIGC has promulgated a class III gaming regulation prescribing the substance of tribal gaming regulation and Tribal-State compacts by requiring 60 percent revenue sharing, arguably in furtherance of the congressionally stated purpose of ensuring that "the Indian tribe is the primary beneficiary of the gaming operation," but here, too, Congress has dictated that that purpose can only be accomplished through "the statutory basis for the regulation of gaming provided in this Act."  25 U.S.C. § 2702(2).  Here, too, there is no such statutory basis in the IGRA empowering the NIGC to prescribe the substance of tribal gaming regulations or Tribal-State compacts regarding impositions; there is no statutory basis for the NIGC to prescribe impositions by regulations on class III gaming in this manner, and as in *Colorado River*, the NIGC has exceeded its statutory authority by promulgating 25 C.F.R. § 522.10(c) in an attempt to regulate class III gaming.

Congress gave the States and Indian tribes broad latitude for compact negotiation.  For example, States are not required to negotiate with respect to forms of gaming they do not

presently permit.  *See, e.g.*, *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250 (9th Cir. 1994) <u>amended</u> by 99 F.3d 321 (9th Cir. 1996); *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273 (8th Cir. 1993).  As part of such negotiations, tribes may agree to compact provisions which the IGRA prohibits a State from unilaterally imposing.  Thus, in exchange for granting a monopoly to tribal gaming establishments, or granting tribes the right to operate games which others were not allowed to operate, IGRA allows tribes to <u>agree</u> to pay fees which a State could not <u>impose</u>.  *See*, *In Re Indian Gaming Related Cases*, 331 F.3d 1110-1112.

In the context of what revenues must go to the Indian tribes from class III gaming, *In Re Indian Gaming Related Cases* is particularly relevant here.  In that case, the Ninth Circuit confirmed that, as part of Tribal-California compacts, California could require a Revenue Sharing Trust Fund and the Special Distribution Fund.  The Revenue Sharing Trust Fund requires California gaming tribes to share gaming revenues with non-gaming California tribes. 331 F.3d at 1105; 1110-1113.  The Special Distribution Fund requires California gaming tribes to pay percentages of their net revenues to California, which is then available for use by the California legislature for specific State purposes.  331 F.3d at 1105; 1113-1115.  The case confirms that such issues are issues for the tribes and the States in the negotiation of a compact, and not for the NIGC to mandate by regulation.

The above circumstances, legislative history, and caselaw show that the NIGC's attempt to justify its supposed authority to promulgate the substantive regulation of class III gaming found in 25 C.F.R. § 522.10(c) based upon 25 U.S.C. § 2710 (b)(4) of the IGRA must fail.  The NIGC assertion of authority to regulate class III gaming in such a manner is plainly inconsistent with the intent expressed by Congress in the IGRA because Congress's clear intent in enacting section 2710(4)(B)(i)(III) was to provide for the continuation of existing non-tribal class II gaming endeavors provided that, among other requirements, such delivered 60 percent

-25-

of their net revenues to the tribe.  Further, the same circumstances and legislative history makes clear that Congress intended that section to deal only with class II gaming bingo and card games.  The legislative history of the IGRA thus confirms that the "not less than 60 percent of net revenue" requirement of section 2710(4)(B)(i)(III) is applicable only to individually operated class II gaming which was also permissible under State law, or which was in operation prior to September 1, 1986, even if not permissible under State law.

**II.**    **THE NIGC'S CONSTRUCTION OF THE IGRA AS MANDATING THAT TRIBAL ORDINANCES AUTHORIZING NON-TRIBAL CLASS III GAMING REQUIRE THAT NOT LESS THAN 60 PERCENT OF NET REVENUES BE INCOME TO THE TRIBE IS NOT A REASONABLE INTERPRETATION, AND IS NOT ONE WHICH CONGRESS WOULD SANCTION.**

There is clearly no explicit legislative delegation in the IGRA to elucidate the class III gaming provisions of the IGRA.  *C.f.*, *Chevron*, 467 U.S. at 844-845.  The IGRA only delegates general rulemaking authority to the NIGC.  25 U.S.C. § 2706.  If the Court determines that Congress delegated authority to the NIGC to promulgate 25 C.F.R. § 522.10(c), that delegation can only be described as implicit; a delegation to make a reasonable accommodation of conflicting policy choices committed to the NIGC's care by the IGRA.  *C.f.*, *Chevron*, at 845. In the case of an implicit delegation of authority, the Court cannot substitute its own construction of the IGRA if the NIGC's interpretation of the IGRA embodied in 25 C.F.R. § 522.10(c) is reasonable.

However, even if the Court determines that the NIGC's interpretation of the IGRA is a reasonable accommodation based upon an implicit delegation, that interpretation is impermissible because the statue, its language, circumstances, purpose, and legislative history clearly show that the NIGC's interpretation of the IGRA embodied in 25 C.F.R. § 522.10(c) is not one that Congress would have sanctioned with respect to non-tribal class III gaming.  *C.f.*, *Chevron*, 467 U.S. at 844-845.  Further, the Indian canon of construction should be a factor in determining if the NIGC interpretation is one that Congress would have sanctioned because the

canon informs the construction of statutes enacted to benefit tribes, and hence the determination of whether the NIGC's interpretation is one that Congress would have sanctioned.

The same reasons which support the conclusion that the regulation at issue here is unlawful under IGRA based upon step one of *Chevron*, also support the conclusion that NIGC's interpretation is both unreasonable and not one which Congress would have sanctioned.  First, there is the clear statutory language of the IGRA which expressly allows a tribe to authorize any person or entity to engage in class III gaming on Indian lands.  Therefore, the requirements for an exception to the sole proprietary interest rule for class II gaming embodied in 25 C.F.R. § 522.10(c) cannot apply to class III gaming for which no exception is required.  That express language is coupled with legislative history which shows that the requirements for an exception to the sole proprietary interest rule relate to class II gaming only.

Second, there is the express statutory language that class III gaming is to be regulated pursuant to Tribal-State compacts, and that those compacts include provisions related to taxation by Indian tribes of such gaming in amounts comparable to amounts assessed by the State for comparable activities.  That express language is bolstered by legislative history which shows that Congress intended States and tribes be allowed to negotiate terms in their mutual best interests, and that what may be in the best interest of one tribe and one State, may not be the same for other tribes in the same State, or for other States.  The language is further supported by legislative history which shows Congress was concerned that tribes not be placed at a competitive disadvantage with gaming outside of Indian lands.  The NIGC interpretation at issue is unreasonable because it effectively mandates a level of taxation of class III gaming which contravenes the "comparable to the State level of taxation" standard provided by Congress in the IGRA.  Third, there is the structure of the IGRA and the fact that it gives the NIGC virtually no role in the regulation of class III gaming.  It is unreasonable for the NIGC to assume for itself, and Congress would not sanction, a role of prescribing the content of tribal

-27-

ordinances which could effectively override provisions of Tribal-State compacts, as is the case here.

Finally, the NIGC interpretation is unreasonable and one which Congress would not sanction because it is inconsistent with the Indian canon of construction.   The Indian canon of construction requires that statutes like IGRA, enacted to benefit tribes, be liberally construed in favor of the tribes with any ambiguous provisions interpreted to their benefit.  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).  The Ninth Circuit Court of Appeals has been less than clear in its decisions on the interplay between *Chevron* and the requirement in *Blackfeet*.  *See, e.g., Williams v. Babbitt*, 115 F.3d 657, 663, n. 5 (9th Cir. 1997) (deferring to agency interpretation under *Chevron* notwithstanding Indian presumption), and *Navajo Nation v. Department of Health and Human Services*, 325 F.3d 1133, 1136, n. 4 (9th Cir. 2003) (leaving for another day "consideration of the interplay between the *Chevron* and *Blackfeet Tribe* presumptions.").  Although the precise role of the Indian canon of construction in the context of *Chevron* deference may be unclear, the Court should be guided by common sense as to the extent which Congress, in enacting the IGRA, a statute which has its roots in tribal self-government, is likely to have delegated to the NIGC a policy decision involving such an important political consideration of tribal self-determination as the substance of Tribal-State gaming compacts and related tribal ordinances or resolutions, and hence the degree to which the tribe may benefit from the IGRA.  *C.f., Brown & Williamson Tobacco*, 529 U.S. at 133.  The IGRA grants the NIGC no such authority to limit the benefits to tribes from class III gaming under the IGRA.

The legislative history with respect to tribal sovereignty is clear.  Senator Inouye, the Chairman of the Select Committee, said that "Indian tribes are sovereign governments and exercise rights of self-government over their lands and members.  This bill does not seek to invade or diminish that sovereignty."  134 Cong. Rec. at 24023 (1988).  Senator Evans, the

Vice-Chairman of that Committee, said "if tribal rights are not explicitly abrogated in the language of this bill, no such restrictions should be construed."  *Id.*, at 24027.

The canon requires construing statutes enacted to benefit tribes in favor of tribal sovereignty, and is relevant where an agency promulgates a regulation that impedes upon tribal independence or sovereignty.  *Colorado River*, 383 F.Supp.2d at 146, *aff'd*, 466 F.3d 134 (D.C. Cir. 2006).   Where the IGRA is ambiguous and the NIGC promulgates a regulation that infringes on tribal sovereignty, the canon militates against reading the IGRA in favor of the NIGC.  *See*, *Colorado River*, 383 F.Supp.2d at 147.

The *Blackfeet* presumption also requires that ambiguous provisions of statutes be construed liberally in favor of, and to the benefit of, Indians.  *See, Artichoke Joe's*, 353 F.3d at 729.  When there is doubt as to the proper interpretation of an ambiguous provision in such a statute, the doubt will benefit the tribe.   Congressman Udall, the Chairman of the House Interior Committee, spoke directly to this issue on the House floor.  Noting that the legislation was enacted for the benefit of tribes, he expected "that the Federal Courts, in any litigation arising out of this legislation, would apply the Supreme Court's time honoring rule of construction that any ambiguities in legislation enacted for the benefit of Indians will be construed in their favor."  134 Cong. Rec. at 25377 (1988).

Further, standard principles of statutory construction do not have their usual force in cases involving Indian law, because the canons of construction applicable in Indian law 'are rooted in the unique trust relationship between the United States and the Indians." *Blackfeet*, 471 U.S. at 766.  Application of the Indian canon of construction requiring the interpretation of ambiguous statutory provisions to the benefit of the tribe, resolves any apparent ambiguities here, leaving no room for application of *Chevron* deference.  Agency constructions of a statute intended to benefit tribes, like the IGRA, that abrogate tribal jurisdiction to determine the

substance of tribal ordinances, like 25 C.F.R. § 522.10(c), raise such grave tribal self-determination concerns that they should not merit *Chevron* deference.

Regardless of the precise interplay between *Chevron* deference and the Indian canon, the NIGC's construction of the IGRA in 25 C.F.R. § 522.10(c) with respect to class III gaming is not one that Congress would have sanctioned.  As noted above, the NIGC interpretation of the IGRA here infringes on tribal sovereignty by mandating the substance of tribal regulation, and in light of the purpose of the IGRA, it is unreasonable and is not one which Congress would have sanctioned.

Here, the IGRA must be construed to not grant the NIGC the authority to mandate that tribes impose a not less than 60 percent of net revenues requirement on non-tribal class III gaming.  Any other construction is a direct interference with tribal sovereignty and tribal self-government, and is inconsistent with Congress's intent to allow tribes and States to negotiate compacts in their best interests, and that States not be allowed to protect State licensed gaming enterprises from the market competition of class III gaming on Indian lands.  The reasonable and Congressionally sanctioned interpretation is one which allows the two sovereigns to strike a deal like the one the Tribe and Nevada struck here.

**III.    CONCLUSION**

For the forgoing reasons, 25 C.F.R. § 522.10(c) is impermissible under the IGRA with respect to non-tribal class III gaming, and Crosby's Motion for Summary Judgment must be granted.

Dated:  February 22, 2010.                    WOODBURN AND WEDGE


By:___/ s / Gordon H. DePaoli___
          Gordon H. DePaoli
          Attorneys for Crosby Lodge, Inc.

1

## <u>CERTIFICATE OF SERVICE</u>

2          I certify that I am an employee of Woodburn and Wedge and that on February 22, 2010,

3   I electronically filed the foregoing *Memorandum of Points and Authorities of Crosby Lodge,*

4   *Inc. in Support of Motion for Summary Judgment* with the Clerk of the Court using the

5   CM/ECF system, which will send notification of such filing to the following via their email

6   addresses:

7
                 James M. Upton
8                james.upton@usdoj.gov

9

10

11                                        _____/ s / Holly Dewar_____
                                          Holly Dewar
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28