UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CROSBY LODGE, INC., a Nevada corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>NATIONAL INDIAN GAMING COMMISSION; PYRAMID LAKE PAIUTE TRIBAL GAMING COMMISSION; MERVIN WRIGHT, JR.; DOES 1 through IV; and PYRAMID LAKE PAIUTE TRIBE OF INDIANS,<br><br>            Defendants. | 3:06-CV-00657-LRH-RAM<br><br>ORDER |

Before the court is Plaintiff Crosby Lodge, Inc.'s ("Crosby") Motion for Summary Judgment (#66[1]). Defendant National Indian Gaming Commission ("NIGC") has filed a cross-motion for summary judgment and an opposition to Crosby's motion (#71).

**I.     Facts and Procedural History**

This is a civil dispute challenging the adoption and enforcement of 25 C.F.R. § 522.10(c), a regulation promulgated by the NIGC pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721. The regulation requires Indian tribes that license individually owned gaming operations to mandate by tribal ordinance "that not less than 60 percent of the net revenues

---

[1]Refers to the court's docket entry number.

be income to the Tribe." 25 C.F.R. § 522.10(c).

Crosby operates a business on the Pyramid Lake Indian Reservation in Washoe County, Nevada. The business primarily consists of a convenience store, a bar, a motel, a gasoline station, and boat storage. The Pyramid Lake Paiute Tribe (the "Tribe") has also licensed Crosby to conduct class III gaming on the property.[2] As such, Crosby operates fifteen slot machines on its premises. The owners of Crosby are private individuals who are not members of the Tribe.

In accordance with IGRA's requirements, on August 4, 1997, the Tribe and the State of Nevada entered into a gaming compact governing class III gaming within the Pyramid Lake Indian Reservation, and on January 6, 1998, the Secretary of the Interior approved the compact. The compact expressly authorizes the licensing of non-tribal class III gaming within the reservation, subject to the concurrent jurisdiction of the Tribe and the State of Nevada. The compact also requires the Tribe to adopt a taxation scheme at least as stringent as the State of Nevada's.

In 1999, the Tribe adopted a Tribal Gaming Ordinance ("ordinance"), and on July 19, 2000, the NIGC approved the ordinance. The ordinance prohibits class III gaming unless a person or entity complies with the terms of the gaming compact and receives a license from the Tribal Gaming Commission. Neither the Tribe's ordinance nor the Tribal-State compact include a specific provision requiring sixty percent of the net revenue of non-tribal class III gaming be income to the Tribe as required by 25 C.F.R. § 522.10(c).

On May 20, 2004, the NIGC's General Counsel sent a letter to the Tribe stating, pursuant to 25 C.F.R. § 522.10(c), sixty percent of the proceeds from individually owned operations on the reservation must go to the Tribe. On September 27, 2005, the NIGC's General Counsel sent

---

[2] Class III gaming is defined as all forms of gaming that "are not class I gaming or class II gaming." 25 U.S.C. § 2703 (8). Class III gaming includes parimutuel horse wagering, banking card games, slot machines, and all games with non-Indian origins. *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002).

2

1 another letter to the Tribe specifically discussing Crosby and stating that Crosby must meet certain
2 requirements, including giving sixty percent of its revenue to the Tribe.  On August 16, 2006, the
3 Pyramid Lake Tribal Gaming Commission informed Crosby that, pursuant to
4 25 C.F.R. § 522.10(c), Crosby owed the Tribe sixty percent of its "net revenue."  Crosby paid the
5 amount due under protest.
6       On December 1, 2006, Crosby filed a complaint alleging that the NIGC exceeded its
7 statutory jurisdiction in enacting 25 C.F.R. § 522.110(c) and that the regulation is unlawful
8 pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.  On February 22, 2010, Crosby filed
9 its motion for summary judgment.  The NIGC subsequently filed its own cross-motion for
10 summary judgment.

11 **II.     Legal Standard**

12       Summary judgment is appropriate only when "the pleadings, the discovery and disclosure
13 materials on file, and any affidavits show that there is no genuine issue as to any material fact and
14 that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©.  In assessing a
15 motion for summary judgment, the evidence, together with all inferences that can reasonably be
16 drawn therefrom, must be read in the light most favorable to the party opposing the motion.
17 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne*
18 *v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).
19       The moving party bears the burden of informing the court of the basis for its motion, along
20 with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*,
21 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party
22 must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could
23 find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.
24 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).  For
25 those issues where the moving party will not bear the burden of proof at trial, the moving party
26

3

must point out to the court "that there is an absence of evidence to support the nonmoving party's case." *Catrett,* 477 U.S. at 325.

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

When, as here, parties file cross-motions for summary judgment on the same claims before the court, the court must consider each party's motion separately and on its own merits. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and opposition to both motions, before ruling on each of them." *Id.* at 1134.

**III.    Crosby's Motion for Summary Judgment**

An administrative agency may not exercise its authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). Thus, the legality of 25 C.F.R. § 522.10(c) turns upon the court's interpretation of IGRA. A two step analysis is used to review an agency's construction of a statute it administers. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837,

4

842 (1984); *Natural Res. Def. Council v. United States EPA*, 526 F.3d 591, 603 (9th Cir. 2008). First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. If the intent of Congress is clear, the court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, the statute is silent or ambiguous with respect to the specific issue, the court must then consider "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

### A.   Congressional Intent

Pursuant to *Chevron*, the court must first determine whether Congress, when it passed IGRA, unambiguously expressed its intent regarding the precise question at issue. *See* 467 U.S. at 842. Crosby contends that the issue before the court is whether provisions in subsection (b) of IGRA, namely the sixty percent net revenue requirement, are statutory *requirements* for non-tribal class III gaming. The NIGC argues that Congress intended the whole of 25 U.S.C. § 2710(b) to apply to non-tribal class III gaming and interprets Section 2710(b) as mandatory restrictions.

At this stage of analysis, the court employs the "traditional tools of statutory construction, including examination of the statute's text, structure, purpose, and legislative history" to determine the intent of Congress. *Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005) (citation omitted).

#### 1. Plain Text

"The starting point for our interpretation of a statute is always with its language." *Tahara v. Matson Terminals, Inc.*, 511 F.3d 950, 953 (9th Cir. 2007) (citation omitted). "Where the words of the statute are unambiguous, . . . judicial inquiry is complete." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003) (citation omitted). "Where the language is not dispositive, we look to congressional intent revealed in the history and purposes of the statutory scheme." *Id.* (citation omitted).

Here, the language of IGRA does not unambiguously support Crosby. IGRA's text states that, if an Indian tribe plans to authorize "any person or entity to engage in . . . a class III gaming

5

1  activity on Indian lands of the Indian tribe," the governing body of the tribe must adopt and submit
2  to the Chairman of the NIGC "an ordinance or resolution that meets the requirements of subsection
3  (b)."  25 U.S.C. § 2710(d)(2)(A).  Included in subsection (b), entitled "Regulation of class II
4  gaming," is a stipulation that any non-tribal class II gaming licenses must include "the
5  requirements described in the subclauses of subparagraph (B)(i)."  25 U.S.C. § 2710(b)(4)(A).  The
6  subclauses of subparagraph (B)(i) contain a stipulation that "not less than 60 percent of the net
7  revenues is income to the Indian tribe."  25 U.S.C. § 2710(b)(4)(B)(i)(III).

8        Nothing in the plain language of IGRA's text suggests that only certain portions of
9  subsection (b) were intended to be requirements for non-tribal class III gaming.  Rather, the plain
10 language simply states that "an ordinance or resolution" must "meet[] the requirements of
11 subsection (b)."  Accordingly, the text of the statute supports NIGC's interpretation of the IGRA.

12                 **2. Statutory Structure**

13       A reviewing court, however, should not "confine itself to examining a particular statutory
14 provision in isolation" to determine congressional intent.  *Brown & Williamson Tobacco Corp.*,
15 529 U.S. at 132.  Instead, the words of the statute "must be read in their overall context and with a
16 view to their place in the overall statutory scheme."  *Id.*

17       IGRA declares class III gaming activities to be lawful on Indian lands if the following
18 requirements are met: (1) the activities are authorized by a tribal ordinance or resolution; (2) the
19 activities are located in a state that permits such gaming for any purpose by any person,
20 organization, or entity; and (3) the activities are conducted in conformance with a Tribal-State
21 compact.  25 U.S.C. § 2710(d)(1).  Such Tribal-State compacts are permitted to include a provision
22 relating to "taxation by the Indian tribe of such activity in amounts comparable to amounts
23 assessed by the State for comparable activities."  25 U.S.C. § 2710(d)(3)(c).

24       Crosby argues that this provision of IGRA demonstrates that Congress intended "that States
25 and tribes be allowed to negotiate compacts which are in their mutual best interests" and that
26

                                                                      6

1  "[c]ompacts were expected to vary extensively depending on the type of gaming and location,"
2  thus making the sixty percent net proceeds subsection a non-mandatory provision. (Pl.'s Memo. P.
3  & A. Mot. Summ. J. (#67) 16.) The NIGC, in contrast, argues that nothing in the statute indicates
4  that one requirement precludes another. While it appears that Congress intended States and tribes
5  to negotiate mutually beneficial compacts, nothing in the text or the structure of IGRA prohibits
6  the NIGC and such Tribal-State compacts from imposing concurrent regulations on non-tribal class
7  III gaming.

8  Crosby also argues that the statutory powers of the Commission demonstrate that "the
9  administrative authority of the NIGC is limited and does not extend to regulation of non-tribal
10 class III gaming." (Pls.' Memo. P. & A. (#67) 7.) Although many of the Commission's delegated
11 powers are mundane and although the statute does not contain an express grant of authority
12 authorizing the NIGC to promulgate a regulation mandating the sixty percent requirement, IGRA
13 expressly provides that the Commission "shall promulgate such regulations and guidelines as it
14 deems appropriate to implement the provisions of the chapter." 25 U.S.C. § 2706(b)(10).
15 Accordingly, it appears that IGRA gives the NIGC wide latitude to administer its authority, and,
16 thus, the structure of the statute supports the NIGC's interpretation.

17 **3. Purpose**

18 "If necessary to determine Congress's intent, we may read statutory terms in light of the
19 purpose of the statute." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th
20 Cir. 2003) (en banc). IGRA expressly lists the purposes of the statute as the following: (1) "to
21 provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting
22 tribal economic development, self-sufficiency, and strong tribal governments"; (2) "to provide a
23 statutory basis . . . adequate to shield [Indian gaming] from organized crime and other corrupting
24 influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to
25 assure that gaming is conducted fairly and honestly"; and (3) to declare that the establishment of an

7

independent federal regulatory authority, federal standards, and the NIGC are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue. 25 U.S.C. §2702.

The "primary beneficiary" language refers to protecting the tribe from organized crime and other corrupting influences. Here, a requirement that sixty percent of non-tribal gaming revenue be income to the tribe does not necessarily protect the tribe from organized crime or corruption. Although such a requirement ensures that the tribe receives the majority of revenue from gaming enterprises conducted on tribal lands, it does not prevent the infiltration of organized crime or unfair gaming practices.

Additionally, the policy of promoting "tribal economic development, self-sufficiency, and strong tribal governments" is relevant to the question at issue here. Crosby argues that "economic development and self-sufficiency can be promoted by taxation of individually owned class III gaming at a level which allows it to actually take place." (Pl.'s Reply & Opp'n (#76) 18.) Crosby also contends that tribal government is not strengthened when the NIGC imposes requirements on the tribe. As such, Crosby provides a viable argument that the NIGC's regulation does not promote the stated policies of IGRA.

### 4. Legislative History

"We will resort to legislative history, even where the plain language is unambiguous, 'where the legislative history clearly indicates that Congress meant something other than what it said.'" *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (citation omitted).

#### a. Oversight Role

The Senate Report states that the NIGC will "participate only minimally in the regulation of class III gaming." S. Rep. No. 100-446, at 1 (1988). The Senate Report also states that the NIGC will have "a regulatory role for class II gaming and an oversight role with respect to class III

8

gaming." S. Rep. No. 100-446, at 10 (1988). "The use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003) (citation omitted). Although the explanation of the NIGC's roles is contained in the legislative history, and not the statute, the court will implement this canon of construction to aid in its interpretation of IGRA. As such, the court assumes that the Senate Committee intended to convey different meanings when it referred to the NIGC's regulatory and oversight roles.

Although it is apparent that Congress intended the NIGC to have different roles with respect to class II and class III gaming, it is not readily apparent whether 25 C.F.R. § 522.10(c) is a permissible exercise of the NIGC's oversight authority. When interpreting statutory provisions, the court looks at the terms of the provisions and the "commonsense conception" of those terms. *Carachuri-Rosendo v. Holder*, 130 S. Ct. 2577, 2585 (2010) (citation omitted).

"Oversight" is defined as "watchful or responsible care" or as "regulatory supervision." Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/oversight. This "commonsense conception" suggests that the sixty percent regulation may extend beyond the NIGC's permissible authority to supervise and watch over or minimally regulate class III gaming.

### b. Unfair Protection of State-Licensed Gaming

The legislative history of IGRA also explains that Congress did not intend the class III compact requirement to be used "for the protection of other state-licensed gaming enterprises from free market competition with Indian tribes." S. Rep. No. 100-446, at 13 (1988). Crosby argues that considering Congress's concern that states would manipulate the compact requirement to unfairly benefit state-licensed gaming enterprises, Congress "would not have placed Indian tribes in a position where they were absolutely required to tax non-tribal class III gaming at a level which ensured such gaming could not compete with State-licensed gaming." (Pl.'s Memo. P. & A. (#67)

9

18.)

A sixty percent net revenue requirement could put non-tribal class III gaming enterprises at a competitive disadvantage. According to statistics from the American Gaming Association, state gaming taxes vary from 6.75% in Nevada to over fifty percent in other states. (Pl.'s Memo. P. & A. (#67), Ex. A.) Accordingly, the sixty percent net revenue requirement could give unfair economic protection to state-licensed gaming enterprises that are taxed at comparatively lower levels. Because the federal regulation may promote state-licensed gaming at the expense of the tribes, the sixty percent requirement does not seem to follow the expressed intent of Congress.

### c. Purposes of Tribal and Non-Tribal Gaming

The Senate Report explains that "[t]he Committee views tribal gaming as governmental gaming, the purpose of which is to raise tribal revenues for member services." S. Rep. No. 100-446, at 12 (1988). In contrast, "the purpose of individually-owned enterprise is profit to the individual owner(s) of Indian trust lands." *Id.* According to the legislative history, Congress intended to protect the profits of non-tribal gaming enterprises. Because the NIGC's sixty percent requirement increases tribal revenues at the expense of the profits of individually-owned enterprises, the regulation seems to be contrary to the intent of Congress.

Based on the review of the statute provided above, the court finds that Congress's intent with respect to licensing requirements for non-tribal class III gaming is ambiguous. While the text of the statute seems to indicate that Congress intended the entirety of subsection(b) to apply to non-tribal class III gaming, the purpose and the legislative history of the statute suggest that Congress did not intend to delegate taxation authority to the NIGC.

**B.     Agency's Construction**

Because the court finds that the intent of Congress concerning the IGRA is ambiguous, the court must move to the second step of the *Chevron* analysis and consider "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If

Congress has explicitly left a gap for the agency to fill with its own discretion, such legislative regulations are given controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44. On the other hand, if the legislative delegation to the agency is implicit, a court may substitute its own construction of the statute unless the agency's interpretation is reasonable. *Id.* at 844. Here, IGRA's delegation to the NIGC is implicit, and, accordingly, the court will follow the reasonableness standard.

The reasonableness standard provides agencies "less latitude" than the arbitrary and capricious standard. *Tovar v. United States Postal Serv.*, 3 F.3d 1271, 1277 (9th Cir. 2003). However, it is not necessary for the court to conclude that the agency's construction was the *only* permissible interpretation of the statute; instead, it is only necessary for the court to conclude that the agency's construction was reasonable *McLean v. Crabtree*, 173 F.3d 1176, 1181 (9th Cir. 1999) (citing *Chevron*, 467 U.S. at 843). If the agency's policy choice was reasonable, it should not be disturbed "unless it appears that from the statute or the legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron*, 467 U.S. at 845 (citation omitted).

Crosby argues that the NIGC's interpretation is unreasonable and one which Congress would not sanction because it is inconsistent with the Indian canon of statutory construction. The Indian canon states that "statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (citation omitted). Crosby contends that the NIGC's interpretation of IGRA impedes upon tribal sovereignty and accordingly should not be given *Chevron* deference.

The court finds that the NIGC's interpretation of the statute does not impede tribal sovereignty. Initially, the court notes that "the Constitution vests the Federal Government with exclusive authority over relations with Indian tribes." *Blackfeet Tribe of Indians*, 471 U.S. at 764 (citing U.S. Const. art. I, § 8, cl. 3). Further, "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux*

11

*Tribe*, 522 U.S. 329, 343 (1998) (citation omitted).

Additionally, the court finds that the IGRA allows for states to enter gaming compacts which protect the financial integrity of the tribe. As such, the NIGC's regulation requiring a sixty percent net revenue requirement in all Class III tribal licenses for non-tribal gaming does not impermissibly impede upon tribal sovereignty. Because Congress's intent with respect to non-tribal class III gaming is ambiguous and because Crosby has not demonstrated that the NIGC's interpretation is unreasonable, summary judgment for Crosby is not appropriate.

## IV.    NIGC's Cross-Motion for Summary Judgment[3]

As explained above, Congress's intent with respect to the taxation of non-tribal class III gaming is ambiguous. Although the plain language of the text seems to suggest that 25 C.F.R. § 522.10(c) is within the scope of the NIGC's authority, the purpose and legislative history of the statute may suggest otherwise. Accordingly, the court must examine whether the NIGC's interpretation of IGRA was a permissible construction of the statute.

"If a statute's language can reasonably be construed in more than one way, a court may not substitute its own construction of the statute for a reasonable interpretation made by the agency that Congress has entrusted to implement the legislation." *Ariz. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1253 (9th Cir. 2007) (citation and internal quotations omitted). Because IGRA's plain text suggests that the entirety of subsection (b) are necessary requirements for non-tribal class III gaming licenses, the NIGC's interpretation of the statute, requiring a sixty percent net revenue payment to the Tribe, is reasonable. A reasonable interpretation of the statute shall not be disturbed or overturned by the court. *See McLean*, 173 F.3d at 1181. Accordingly, the court shall grant NIGC's cross-motion for summary judgment.

///

---

[3] NIGC provides the same arguments and evidence in its cross-motion for summary judgment as in its opposition to Crosby's motion for summary judgment.

12

1  IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (#66) is
2  DENIED.
3  IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment (#71)
4  is GRANTED.
5  The Clerk of the Court shall enter judgment accordingly.
6  IT IS SO ORDERED.
7  DATED this 12th day of March, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

13